UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Human Rights Defense Center, | Civil File No. 0:20-cv-01817 ADM/HB |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| Sherburne County, Minnesota; Joel Brott, Sheriff, in his official and individual capacities; and Does 1-10, in their individual capacities, | |
| Defendant. | |

## INTRODUCTION

Plaintiff, Human Rights Defense Center ("HRDC" or "Plaintiff"), moves for a preliminary injunction under Federal Rule of Civil Procedure 65 to enjoin Sherburne County, Minnesota, Sheriff Joel Brott, and Does 1–10 (collectively, "Defendants") from unconstitutionally censoring HRDC's magazines sent to incarcerated persons.

HRDC seeks to provide incarcerated persons with reading materials regarding their legal and civil rights and options for accessing education and self-improvement while incarcerated. Since at least June 2019, and on an ongoing basis, Defendants refuse to deliver HRDC's magazines to persons incarcerated at the Sherburne County Jail (the "Jail"), violating HRDC's First Amendment right to communicate information to these individuals. In addition, Defendants have failed to provide HRDC notice and an opportunity to challenge its censorship decisions, in violation of the Due Process Clause to the Fourteenth Amendment. Defendants' serious violations of the Constitution are causing

HRDC irreparable harm.  As a settled matter of First Amendment law, the continued deprivation of HRDC's free-speech rights is precisely the irreparable harm that justifies preliminary injunctive relief.

HRDC's magazines pose no threat to the safety and security of the Jail, and in fact, are widely distributed in jails and prisons all over the United States.  HRDC has no alternative means of communicating with persons incarcerated at the Jail.  These incarcerated persons have limited alternative means of accessing information about their legal and civil rights and educational opportunities—information crucially important to assisting these individuals in participating in their legal defense, preparing to re-enter society as productive citizens, and avoiding COVID-19.  Because of Defendants' arbitrary mail policies, most individuals incarcerated in the Jail have extremely limited access to reading and educational materials.

To remedy these constitutional violations, HRDC requests the Court enter a preliminary injunction (1) prohibiting Defendants from arbitrarily and illegally censoring magazines sent to incarcerated persons at the Jail; and (2) requiring that Defendants satisfy due process by providing HRDC with notice of any rejections of its magazines by the Jail and an opportunity to appeal any such rejections.

## STATEMENT OF FACTS

### A.  HRDC's Publications

The Human Rights Defense Center is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the state of Washington and with principal offices in Lake Worth, Florida.  For more than 30 years,

HRDC has focused its mission on public education, advocacy, and outreach on behalf of, and for the purpose of assisting, incarcerated persons who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights. HRDC accomplishes this mission through advocacy, litigation, and the publication and/or distribution of books, magazines, and other information concerning prisons and the rights of incarcerated persons. *See* Declaration of Paul Wright in Support of Motion for Injunctive Relief ("Wright Decl.") ¶ 2.

HRDC publishes and distributes an award-winning, 72-page monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains news and analysis about prisons, jails, and other detention facilities, prisoners' rights, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals. *Id.* ¶ 4. HRDC has thousands of subscribers to its monthly magazine in the United States and abroad, including incarcerated persons, attorneys, journalists, public libraries, judges, and members of the general public. *Id.* ¶ 9. Since its creation in 1990, HRDC has sent its publications to prisoners and law librarians in more than 3,000 correctional facilities across the United States, including death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado—the most secure prison in the United States. *Id.* ¶ 10. *Prison Legal News* is distributed to prisons and jails within the correctional systems of all 50 states, including to dozens of incarcerated persons housed in facilities in Minnesota. *Id.* More recently, HRDC also began publishing a second monthly magazine, *Criminal Legal News*. This magazine is 56

pages long and focuses on review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues. *Id.* ¶ 5.

HRDC has been trying to send these important publications to persons incarcerated at the Jail, some of whom spend years in that facility. *See* Declaration of Dontay Reese in Support of Motion for Injunctive Relief ("Reese Decl.") ¶¶ 2–3. Yet Defendants maintain mail policies or practices that unconstitutionally prevent HRDC from sending its magazines to individuals incarcerated at the Jail.

### B. Defendants' Unconstitutional Mail Policies and Practices

According to the Sherburne County Jail mail policy:

> "Inmate mail will be checked for contraband prior to distribution.
>
> Examples of items considered to be contraband are:
>
> ….
>
> - Newspapers/Magazines: including small clippings or articles"

Sherburne County Jail mail policy, *available at* https://www.co.sherburne.mn.us/314/Inmate-Phone-Email-Provider-Mail (last visited August 19, 2020). *See also* Wright Decl., Exhibit A. Further, the Jail's mail policy has no provision for giving notice to the sender when mail is rejected.

The Jail's Policy and Procedure Manual specifically bans magazines and allows one daily newspaper for each general population unit. *See* Declaration of Donna Reuter in Support of Motion for Injunctive Relief ("Reuter Decl."), Exhibit C ("No magazines are allowed in the facility."); Reuter Decl., Exhibit A at 1 (stating books and periodicals are

considered contraband); Reuter Decl., Exhibit B at 3 ("A daily newspaper(s) shall be provided . . . Newspapers shall be kept in the housing unit dayroom and are not allowed to be brought in an inmate's cell.").

Access to alternate sources of news and reading materials is almost non-existent. Inmates in general population may watch some television daily, but channel selection is based on group consensus. *See* Reuter Decl., Exhibit B at 2. The jail "library" is a book cart, rotated throughout the facility on a weekly basis. *Id*. at 3. Inmates do not have access to electronic versions of publications or reading materials. Reese Decl. ¶¶ 14–15.

Furthermore, inmates in segregation have even more restricted access to magazines, newspapers, books, or television. *See* Reuter Decl., Exhibit B at 2; Reese Decl. ¶¶ 9, 11.

### C. Defendants' Censorship of HRDC's Mail

Beginning in June 2019, Defendants censored monthly issues of *Prison Legal News* and *Criminal Legal News* sent by HRDC to incarcerated persons held in the Jail. Wright Decl. ¶ 15. *See* Reese Decl. ¶ 3 (documenting inmate's request that HRDC suspend his subscription because the jail would not deliver it to him, but expressing his continued interest in receiving the publication). Defendants refused, and continue to refuse, to deliver said items to the incarcerated persons. Wright Decl. ¶¶ 15–16. Moreover, Defendants have entirely failed to notify HRDC about the censorship of *Prison Legal News* and *Criminal Legal News*, and HRDC was provided no opportunity to appeal the censorship of its magazines. *Id.* ¶¶ 17–18.

By adopting and applying such policies, and by doing so without due process, the Jail is irrationally interfering with protected expressive activities and chilling future speech.

Since HRDC continues to attempt, and will continue to attempt, to communicate with incarcerated persons confined in the Jail through its publications, Wright Decl. ¶ 19, Defendants' policies and practices will violate HRDC's free speech rights in the future without due process, causing irreparable harm.

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a preliminary injunction on notice to the adverse party.  A plaintiff seeking a preliminary injunction must meet the following four factors:  (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest.  *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 966 (8th Cir. 1999).  *See also Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  When the Court determines that a movant is "likely to win on the merits of their First Amendment claim, a preliminary injunction is proper."  *Rodgers v. Bryant*, 942 F.3d 451, 459 (8th Cir. 2019) (internal quotation marks omitted).

## ARGUMENT

HRDC respectfully moves the Court to enter a preliminary injunction prohibiting Defendants from continuing to violate HRDC's constitutional rights to free speech and due process.  The Court should grant HRDC's motion because: (1) HRDC is likely to succeed on the merits of its claims; (2) HRDC is currently suffering and will continue to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in HRDC's favor; and (4) an injunction is in the public interest.

### A.  HRDC is Likely to Succeed on the Merits of Its Claims.

#### 1.  First Amendment Claim

A publisher's right to send publications and other correspondence to incarcerated persons is clearly established.   "[T]here is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (alterations added); *see also Prison Legal News v. Simmons, sub nom Jacklovich v. Simmons*, 392 F.3d 420, 422, 431 (10th Cir. 2004) (recognizing a First Amendment right for incarcerated persons to receive information from Prison Legal News while in prison). "It is equally certain that [p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the inside."  *Thornburgh*, 490 U.S. at 407 (internal quotation marks and citation omitted).

Indeed, the interests of senders and their intended recipients are "inextricably meshed," and "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners."  *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 413–14 ("to the extent that *Martinez* itself suggests such a distinction [between incoming correspondence from prisoners and nonprisoners], we today overrule that case"). "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech."  *Id*. at 408.  Further, HRDC's speech covers topics of great public

concern and such "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance.").

Accordingly, to withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four *Turner* factors. *Turner v. Safley,* 482 U.S. 78, 89 (1987), *superseded by statute* 42 U.S.C. §§ 2000bb (RFRA) (free exercise claims reviewed under the compelling interest standard, not at issue here). The first *Turner* factor asks whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Roe v. Crawford*, 514 F.3d 789, 794 (8th Cir. 2008) (quoting *Turner*, 482 U.S. at 89). The second factor analyzes whether the inmate has an alternative means of exercising his constitutional right. *Id.* The third factor addresses the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and the fourth factor analyzes the "existence, or absence of obvious, easy alternatives . . . that fully accommodate[] the prisoner's rights at *de minimus* cost to valid penological interests." *Id.* at 794–95 (alterations in original) (quoting *Turner*, 482 U.S. at 91). While this case involves the free speech rights of free persons, and not of incarcerated persons, for purposes of this motion, HRDC assumes that the Court will employ the *Turner* test as a means of ensuring that any injunctive relief incorporates due deference for the exigencies of jail operation. *See Hrdlicka v. Reniff*, 631 F.3d 1044, 1049

(9th Cir. 2011) (reasoning that the Supreme Court's opinion in *Turner* addresses precisely the First Amendment concerns of a publisher distributing unsolicited publications to inmates). HRDC is highly likely to prevail on each of the *Turner* factors with regard to Defendants' censorship.

### a. Defendants' Mail Policies and Practices Are Not Rationally Related to Any Legitimate Penological Objectives.

The first factor a court considers in determining the validity of a prison regulation is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89. This factor is "actually more of an 'element' than a factor in the sense that it is not simply a consideration to be weighed but rather an essential requirement." *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007) (internal citation and quotation marks omitted); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003) ("The first factor is a sine qua non.").

Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (*quoting Turner*, 482 U.S. at 89–90). That is, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to

show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357 (internal citation and quotation marks omitted); *see also Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir. 1990) ("Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An *evidentiary showing* is required as to each point." (emphasis added)).

That is, while respectful of correctional officials' expertise, *Turner's* "reasonableness standard is not toothless." *Beard*, 548 U.S. at 535 (citing *Thornburgh*, 490 U.S. at 414) (internal quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[D]eference does not imply abandonment or abdication of judicial review."). Rather, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) (emphasis in original); *see also Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989) ("[P]rison officials do not set constitutional standards by fiat.").

Although courts prefer to avoid getting involved in the administration of jails, such "wide-ranging deference to the determinations of prison administrators is not boundless." *Nichols v. Nix*, 810 F. Supp. 1448, 1456 (S.D. Iowa 1993) ("[F]ederal courts must protect the constitutional rights of prison inmates in the face of a prison regulation or practice which offends a fundamental constitutional guarantee."). Courts across the country have recognized that jail policies banning the receipt of publications are unconstitutional. *See,*

*e.g., Jacklovich*, 392 F.3d at 431–434 (ban on gift publications unconstitutional); *Johnson v. Forrest Cty. Sheriff's Dep't*, 2000 U.S. App. LEXIS 40970, at *2 (5th Cir. Feb. 15, 2000) (per curiam) ("A blanket ban on newspapers and magazines on the basis that they constitute a fire hazard or pose a threat to plumbing violates the First Amendment."); *Thomas v. Leslie*, 1999 U.S. App. LEXIS 7795, at *23 (10th Cir. Apr. 21, 1999) (finding that an "absolute ban on newspapers" violates the First Amendment); *Crofton v. Roe*, 170 F.3d 957, 960–61 (9th Cir. 1999) (striking down prison ban on gift publications); *Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (noting that prisoners have a "First Amendment right to receive and to read newspapers and periodicals"); *Green v. Ferrell*, 801 F.2d 765, 772 (5th Cir. 1986) (holding that jail's prohibition on newspapers violates First Amendment); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (finding a "policy that forbade inmates to receive or possess newspapers and magazines" violated First Amendment).

Here, Defendants' policy of censoring newspapers and magazines fails to advance any legitimate penological objective; indeed, Defendants' censorship of HRDC's magazines actively impedes the important penological objective of rehabilitating incarcerated persons. The U.S. Supreme Court has recognized that since "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (internal citation and alteration omitted). Further, the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation . . . ." *Martinez*, 416 U.S. at 412–13; *see also Cline v. Fox*, 319

F. Supp. 2d 685, 694 (N.D. W.Va. 2004) (access to reading material "may benefit inmates," and "[g]ood books . . . lift the spirit, improve the mind, enrich the human personality, and develop character" (internal citation omitted)).  As such, it is difficult to see how depriving an incarcerated person of knowledge about the outside world could help prepare this person for his or her eventual return to that world.  *See Martinez*, 416 U.S. at 412 n.13.

It is even more critical that prisoners have access to HRDC's publications since the outbreak of the novel coronavirus pandemic.  It is impossible for prisoners to implement the best practices for virus prevention in a carceral setting.  Wright Decl., ¶ 7.  *Prison Legal News* and *Criminal Legal News* have been providing prisoners with information about how to stay safe and healthy while incarcerated.  *Id.*, ¶ 7.  For example, the cover story in the April 2020 issue of *Prison Legal News* is entitled "Protect Yourself and Your Facility from COVID-19," and it contains a doctor's advice regarding social distancing and keeping facilities clean.  *Id.*, Exhibit B.  Giving subscribers methods to minimize the chances of catching the virus is obviously beneficial to them, but it also positively impacts the facility's operations and interactions with Jail staff.  Prisons and jails are constitutionally mandated to provide adequate medical treatment, *see, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration."), which can be a huge strain on a jail's manpower and financial resources.

Because Defendants' mail policies and practices are not rationally related to any legitimate penological objectives, and in fact, hamper the crucial penological objectives of rehabilitating incarcerated persons and protecting prisoners' health, the first *Turner* factor

weighs in HRDC's favor.

      **b.  There Are No Alternative Avenues for HRDC to Exercise Its First Amendment Right to Communicate Information to Persons Incarcerated in the Jail.**

The second *Turner* factor concerns whether there exist alternative means to exercise the constitutional right in question.  The Supreme Court has made it clear that the absence of such alternative means may be seen as evidence that the prison regulations in question are unreasonable.  *See Beard*, 548 U.S. at 532 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (holding that "no alternative means of communication" is "some evidence" that the prison regulations at bar were "unreasonable.")).

Defendants provide HRDC with no alternative means of effectively communicating the information in its magazines to incarcerated persons in the Jail.  *See* Reese Decl. at ¶ 14 (stating that the Jail has no electronic means of accessing reading materials and that limited email communications are censored).  HRDC cannot reasonably be expected to communicate its written speech to incarcerated persons by telephone or in-person with prisoners in each of the over 5,000 prisons and jail in America.  Even if prisoners have other ways to get information, HRDC's messages can be conveyed effectively only through print publications.  *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if prisoners can obtain general information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines").  Under Defendants' current policy and practice, HRDC is left with no reasonable way to reach its intended audience.

### c. Accommodating HRDC's First Amendment Rights Would Impose No Significant Burden on the Jail Authority's Officials, Other Incarcerated Persons, or Defendants' Allocation of Resources.

The third *Turner* factor is the effect an accommodation of the constitutional right in question will have on incarcerated persons, prison staff, and on prison resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. at 414 n.14. In other words, the fact that numerous other institutions are effectively able to accommodate the constitutional right in question indicates that the Jail's policy is not necessary.

Since its founding in 1990, HRDC has sent its magazines to thousands of incarcerated persons nationwide. HRDC distributes its publications to correctional facilities across the United States, including the Federal Bureau of Prisons, which houses almost two hundred thousand inmates, without censorship. Notably, HRDC is unaware of any state or federal prison where HRDC's magazines, books, or other correspondence have created a security problem. Wright Decl. ¶ 11. Even some jails have recognized, after rescinding publication bans, that allowing prisoners to read books and magazines is a "win-win" for everyone involved. *See Prison Legal News v. Northwestern Reg'l Jail Auth.*, 2019 U.S. Dist. LEXIS 168591, at *9–10 (W.D. Va. Sept. 30, 2019). This is strong evidence that the third *Turner* factor favors HRDC and an arbitrary barrier to HRDC's communications irrationally interferes with core protected speech.

### d. Defendants' Mail Policy is an Exaggerated Response to Perceived Security Concerns.

The final *Turner* factor is whether the regulation in question is an exaggerated response to prison concerns. *See Turner*, 482 U.S. at 90. Here, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ." *Id*. When a court finds that a restriction on an incarcerated person's constitutional rights is an "exaggerated response" to prison concerns, the restriction cannot stand. *Id*. at 97–99. As mentioned above, the fact that thousands of correctional facilities nationwide accept HRDC's materials strongly suggests that the Jail's censorship is an exaggerated response. *See, e.g.*, *Hrdlicka*, 631 F.3d at 1055 (final *Turner* factor favored publisher challenging county jail regulation where it was undisputed that publisher's magazine was already distributed in other California county jails). There is an easy, obvious alternative to Defendants' censorship: the Jail can effectuate a mail-processing system consistent with the industry norm where publications are reviewed individually to determine whether they pose a risk to a penological objective.

The above analysis demonstrates that each of the *Turner* factors weighs in HRDC's favor. Defendants' mail policy is an illegal intrusion on HRDC's First Amendment rights, and HRDC is likely to succeed on this claim.

## 2.  The Jail's Policy Also Violates Due Process

The Supreme Court has long recognized that a publisher's right to communicate with incarcerated persons is rooted not only in the First Amendment, but in the Fourteenth Amendment as well. *See Martinez*, 416 U.S. at 417–19. The Due Process Clause requires

a correctional institution, each time it censors an incoming publication, to provide both the prisoner and the sender with notice and an opportunity to challenge the censorship.

The Eighth Circuit has been clear about this, and yet the Jail refuses to comply: "An inmate whose mail is withheld must receive notice, an opportunity to be heard, and an opportunity for appeal to a prison official who was not involved in the original censorship decision." *Murphy v. Missouri Dep't of Corrections*, 814 F.2d 1252, 1258 (8th Cir. 1987) (citing *Martinez*, 416 U.S. at 418–19); *see also Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977). Prisons must also provide senders of publications with procedural protections, since giving notice and an opportunity to be heard to the prisoner alone will not suffice. *Montcalm Publ. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). "An inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication." *Id*. The *Montcalm* Court noted that "providing a copy of [a rejection notice] to publishers of disapproved publications and allowing the publishers to respond in writing would pose a minimal burden on corrections officials." *Id*. *See Trudeau v. Wyrick,* 713 F.2d 1360, 1366 (8th Cir. 1983) (concluding that the warden's duty required giving some "form of notice to the author and to the intended recipient that delivery of the letter was being upheld"). "Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech." *Martin v. Kelley,* 803 F.2d 236, 244 (6th Cir. 1986); *see also Jacklovich,* 392 F.3d at 433.

Here, Defendants plainly violated HRDC's due process rights. No notice whatsoever was provided to HRDC when its publications were not delivered by the Jail. Wright Decl. ¶ 17. Nor was there any opportunity to appeal the rejection of *Prison Legal*

*News*, *Criminal Legal News*, or any other materials. *Id*. ¶ 18.

An opportunity to be heard is a crucial, constitutionally-mandated chance to correct errors and challenge censorship decisions. *See Murphy*, 814 F.2d at 1258. Providing notice and an opportunity to appeal is important because it allows publishers to investigate and challenge violations of their First Amendment rights, as well as to assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm*, 80 F.3d at 108–09. If correctional facilities are allowed to unilaterally choose not to deliver items to inmates without any notice, it is impossible for publishers and incarcerated persons to know what materials are not being delivered and subsequently challenge the basis for the refusals. *See id.* at 109.

Correctional facilities in other jurisdictions provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. For instance, the Federal Bureau of Prisons has an explicit policy requiring it to notify incarcerated persons and publishers, identifying the specific articles or materials rejected and allowing independent review of a warden's rejection decision. *See Thornburgh*, 490 U.S. at 406; Federal Bureau of Prisons Program Statement 5266.11(2). This policy was upheld by the U.S. Supreme Court and acts as a model for other correctional facilities. *See e.g., Prison Legal News v. Stolle,* 319 F. Supp. 3d 830, 841 (E.D. Va. 2015).

Defendants in this case failed to provide HRDC notice that its magazines were not being delivered, and afforded no opportunity to challenge these decisions. Therefore, they violated HRDC's due process rights, and HRDC is likely to succeed on this claim.

**B. Defendants' Constitutional Violations Are Causing HRDC to Suffer Irreparable Harm.**

Irreparable harm and inadequacy of legal remedies forms the basis of injunctive relief in the federal courts. *See Coffelt v. Omaha Sch. Dist.*, 309 F. Supp. 3d 629, 635 (W.D. Ark. 2018). An inadequate remedy at law exists when the injuries cannot be fully compensated through an award of monetary damages. *Id.* In the context of a preliminary injunction, the Supreme Court has explained that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (internal citation omitted); *Iowa Right to Life*, 187 F.3d at 970. The violation of a First Amendment right is presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) (internal citation omitted). "[M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *see also Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("chilled free speech . . . could not be compensated for by monetary damages."). Further, "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (internal quotation marks omitted); *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (upon

showing a likelihood of success on the merits in the First Amendment context, the other factors are satisfied; irreparable injury is deprivation of First Amendment rights; injury outweighs defendant's inability to enforce unconstitutional statute; public interest in free expression is protected).

Accordingly, courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g.*, *Caruso*, 569 F.3d at 277–78 (affirming grant of preliminary injunction against prison mail policy) (*quoting Elrod*, 427 U.S. at 373); *Prison Legal News v. Lehman*, 397 F.3d 692, 699–701 (9th Cir. 2005) (affirming grant of permanent injunction of prison ban on non-subscription bulk mail and catalogs requested by incarcerated person). The irreparable harm suffered by HRDC is concrete, severe, and ongoing. Defendants will continue to censor HRDC's magazines sent to incarcerated persons without due process, thwarting HRDC's core protected speech on government policies, the civil and legal rights of incarcerated persons, jail conditions, and the criminal justice system. This is especially so because *Prison Legal News* and *Criminal Legal News* report on current newsworthy topics on a monthly basis. Wright Decl. ¶ 6. The passage of time saps the magazines of their news value. *Id.* Presumably, other publishers have been or will be censored in the same way. Accordingly, HRDC will continue to suffer irreparable harm without a preliminary injunction.

### C. The Balance of Equities Weighs in HRDC's Favor.

In ruling on a preliminary injunction motion, a court must determine "whether the balance of equities tip[s] in [plaintiff's] favor." *Jones v. Jegley*, 947 F.3d 1100, 1104–05 (8th Cir. 2020). Importantly, in First Amendment cases, the most important factor is the

likelihood of success. *Id.* at 1105. *See also Rodgers*, 942 F.3d at 466 ("Generally, if a party shows a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied" (internal quotation marks omitted).). Thus, when an action "is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014) (internal brackets omitted).

Here, any potential injuries to Defendants are minimal and speculative. No great cost or expenditure of time is required to change the current policies to allow HRDC to deliver its magazines to incarcerated persons and afford constitutionally mandated due process; indeed, this is the very process that is used at the Federal Bureau of Prisons and by the majority of jails and prisons across the country. *See Bear v. Kautzky*, 305 F.3d 802, 805 (8th Cir. 2002) (concluding that the balance of harms tipped in the inmates' favor because the defendants "presented no evidence that continued legal communications during the pendency of the[] proceedings would cause harm at [the state penitentiary]"). Their experience demonstrates that there would be no substantial harm to Defendants if they were enjoined from enforcing the mail policy now in effect.

In contrast, as noted *supra*, the irreparable harm suffered by HRDC is concrete, severe, and ongoing. Accordingly, the balance of equities tips in HRDC's favor given the irreparable harm suffered by HRDC in the absence of a preliminary injunction, and the minimal effort necessary to vindicate its rights under the First and Fourteenth Amendments.

### D.  A Preliminary Injunction Serves the Public Interest.

Finally, the last factor supporting issuance of a preliminary injunction requires consideration of the public interest.  *Dataphase Sys.*, 640 F.2d at 113; *see also Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 25 (2008).  "It is always in the public interest to protect constitutional rights and the balance of equities . . . generally favors the constitutionally-protected freedom of expression."  *Rodgers*, 942 F.3d at 458 (internal quotation marks omitted).  In that regard, the First Amendment furthers a compelling public interest. Indeed, as the Eighth Circuit has held, "the public interest favors protecting core First Amendment freedoms."  *Iowa Right to Life*, 187 F.3d at 970.  *See also Rodgers*, 942 F.3d at 459–60 (affirming the district court's grant of a preliminary injunction as "the potential for harm extends beyond the parties"); *Bear*, 305 F.3d at 805 (affirming the preliminary injunction and the lower court's finding that protecting the constitutional rights of inmates outweighed the public interest "in minimizing court interference in the orderly and secure running of the prison system").  As set forth above, as the Jail continues to violate the Constitution, the public interest demands the issuance of a preliminary injunction.

As discussed above, it is also in the public interest to allow prisoners access to reading materials while incarcerated.  Reading materials enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in the jail.  Wright Decl. ¶ 12.  In addition, reading allows detainees to keep their minds sharp, helping them to be productive citizens when released back into society.  This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Martinez,* 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind

an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions. . . . It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.").

### E.  The Bond Requirement Should Be Waived.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond.  *See, e.g.*, *Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011) (setting bond at $1.00 for a preliminary injunction involving a violation of the Americans with Disabilities Act); *Bukaka, Inc. v. County of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993) (waiving bond requirement in a case involving First Amendment rights, where requiring a bond "could prevent judicial review of [a] code's constitutionality"); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.") (quoting *Cal. ex. rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)); *Ctr. for Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1061–62 (N.D. Cal. 2010) (waiving bond requirement for small non-profit organization suing government entity because bond would effectively deny access to judicial review).

Waiving the bond requirement is appropriate here because HRDC is a small non-profit organization of sixteen employees that would be unable to post anything more than

a nominal bond.  Wright Decl. ¶ 28.  A bond requirement would effectively deny access to judicial review for HRDC, which is especially harmful because HRDC is alleging violations of its fundamental rights under the Constitution.  *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## <u>CONCLUSION</u>

HRDC is likely to succeed on the merits of its constitutional claims.  HRDC is suffering and will continue to suffer irreparable harm to its First and Fourteenth Amendment rights that far outweigh any possible harm to Defendants from the issuance of an injunction.  HRDC lacks any adequate remedy at law to address the ongoing violations of its constitutional rights.  Finally, the public interest favors the protection of HRDC's constitutional rights.  For these reasons, HRDC respectfully requests that this Court grant its motion for preliminary injunctive relief.

Dated: August 20, 2020

Respectfully submitted,

/s/ *R.J. Zayed*

DORSEY & WHITNEY, LLP
    RJ Zayed (#0309849)
    zayed.rj@dorsey.com
    Alex P. Hontos (#0388355)
    hontos.alex@dorsey.com
    Donna Reuter (#0400572)
    reuter.donna@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
Telephone: (612) 492-6711
Facsimile: (612) 573-665

HUMAN RIGHTS DEFENSE CENTER
Daniel Marshall*
Eric Taylor*
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Facsimile: (561) 828-8166
dmarshall@humanrightsdefensecenter.org
etaylor@humanrightsdefensecenter.org

*Attorneys for Plaintiff Human Rights Defense Center*

*\*Pro hac vice applications to be filed*