UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Human Rights Defense Center,

    Plaintiff,

v.

Sherburne County, Minnesota;
Joel Brott, Sheriff, in his official
and individual capacities; and
Does 1-10, in their individual
capacities,

    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 20-1817 ADM/HB

_____

R.J. Zayed, Esq., Alex P. Hontos, Esq., and Donna Reuter, Esq., Dorsey & Whitney, LLP, Minneapolis, MN, and Daniel Marshall, Esq., and Eric Taylor, Esq., Human Rights Defense Center, Lake Worth, FL, on behalf of Plaintiff.

Vicki A. Hruby, Esq., and Joseph E. Flynn, Esq., Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, MN, on behalf of Defendants Sherburne County and Sheriff Joel Brott.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Plaintiff Human Rights Defense Center's ("HRDC") Motion for Preliminary Injunction [Docket No. 6]. For the reasons set forth below, HRDC's Motion is denied.

## II. BACKGROUND

### A. Parties

HRDC is a non-profit charitable organization that publishes and distributes books, magazines, and other information about prisons and the rights of incarcerated persons. Wright Decl. [Docket No. 8] ¶ 2. HRDC's publications include a 72-page monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights* ("*Prison Legal News*"), and a 56-

page monthly magazine titled *Criminal Legal News*.  Id. ¶¶ 4–5.  HRDC distributes its magazines and books to more than 3,000 correctional facilities in the United States.  Id. ¶ 10.  The magazines are sent to customers at individualized addresses using the United States Postal Service.  Id. ¶ 8.

Defendant Sherburne County, Minnesota (the "County") operates the Sherburne County Jail (the "Jail") under the oversight of Defendant Joel Brott ("Sheriff Brott").  Compl. [Docket No. 1] ¶ 13; Answ. [Docket No. 29] ¶ 13.  The Jail is a 732-bed facility located in Elk River, Minnesota with eight housing units typically housing over 600 inmates and detainees.  Frank Aff. [Docket No. 27] ¶¶ 1, 3.  The Jail has 184 employees including correctional officers and administrators, and also contracts with medical and kitchen staff.  Id. ¶ 4.

**B.  Jail Policies**

The Jail's policies on inmate mail and contraband prohibit inmates from possessing magazines or personal newspapers.  Id. ¶ 8, Ex. B.  The inmate mail policy, posted on the Jail's website, states:  "Inmate mail will be checked for contraband prior to distribution.  Examples of items considered to be contraband are:  . . . Newspapers/Magazines:  including small clippings or articles."  See Sherburne County Sheriff's Office, Sherburne County Jail Inmate Mail Policy, https://www.co.sherburne.mn.us/314/Inmate-Phone-Email-Provider-Mail (last visited Nov. 30, 2020).  The Inmate Handbook similarly provides:

> Some common forms of contraband or items that will be removed from the mail include:
>
> . . .
>
> • **Newspapers/Magazines:** Newspaper and magazine items will be removed and placed in the inmate's property bag. This includes small clippings of articles, horoscopes, crossword

>   puzzles, etc.

Hruby Aff. [Docket No. 26] Ex. 2 (Inmate Handbook) at 8.

Under the Jail's inmate mail policy, inmates are allowed to receive unlimited daily letters, as well as emails from friends and family.  Inmate Handbook at 7, 9.  Inmates may also receive soft covered books from a publisher or vendor.  Id. at 9.

Although the Jail's policies prohibit personal newspapers and magazines, two copies of the *Minneapolis Star Tribune* daily newspaper are provided in the common space of each housing unit.  Frank Aff. ¶ 13; Hruby Aff. Ex. 1 at 13.06(A), 21.04.04(D).  Inmates may also receive news articles via email unless the content of the article presents a security threat.  Frank Aff. ¶ 13.  Inmates have access to books through the Jail's library, and also have access to legal materials through the Jail law library, Minnesota Sate Law Library, and the Jail's online legal research subscription.  Id. ¶¶ 14–15; Hruby Aff. Ex. 1 at 21.04.04(D).  The Jail library accepts book donations from "government agencies, schools, local organizations and charities, and Sherburne County government center employees."  Hruby Aff. Ex. 1 at 23.06.01(A).

To reduce the risk of fire and minimize sanitation issues at the facility, the Jail places limitations on the amount of printed material an inmate may possess in their cell.  Frank Aff. ¶ 16.  Inmates may keep up to six books and a reasonable amount of case-related legal materials in their cells.  Id. ¶¶ 16, 18.  Excess books and legal materials are stored in the inmate's property bag.  Id. ¶ 18.  No magazines are allowed at the facility.  Hruby Aff. Ex. 1 at 21.04.04(D).

**C.  Publications Rejected, Lawsuit Filed**

Since at least June 2019, Defendants have refused to deliver *Prison Legal News* and *Criminal Legal News* to inmates at the Jail based on the Jail's policies prohibiting magazines and

3

personal newspapers.  Wright Decl. ¶ 15; Reese Decl. [Docket No. 9] ¶ 3.  Defendants did not send notice to HRDC that the magazines had been rejected and did not give HRDC an opportunity to appeal the rejection.  Wright Decl. ¶¶ 17, 18.

On August 20, 2020, HRDC filed this action alleging that Defendants' policies and refusal to deliver its magazines to Jail inmates violate HRDC's First Amendment right to communicate with incarcerated individuals.  Compl. ¶¶ 44–51.  HRDC also alleges that Defendants' failure to provide HRDC with adequate notice and an opportunity to challenge the rejection of the magazines violates HRDC's Fourteenth Amendment right to due process.

Simultaneous with the filing of its Complaint, HRDC also moved for a preliminary injunction asking the Court to:  (1) enjoin Defendants from enforcing its policies against the delivery of magazines and newspapers to inmates at the Jail; (2) enjoin Defendants from refusing delivery of HRDC materials to inmates at the Jail; and (3) require Defendants to provide HRDC with notice, an opportunity to be heard, and the right to appeal the denied delivery of reading materials.  Mot. at 1.

### III.  DISCUSSION

**A.  Legal Standard**

A preliminary injunction is an "extraordinary remedy," and the movant bears the burden of establishing its propriety.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  The court considers four factors in determining whether a preliminary injunction should issue:  "(1) probability of success on the merits; (2) threat of irreparable harm; (3) the balance between this harm and potential harm to others if relief is granted; and (4) the public interest."  Iowa Right to Life Comm., Inc. v. Williams, 187 F.3d 963, 966 (8th Cir. 1999); see also Dataphase Sys., Inc. v.

C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). No single factor is determinative and the "pragmatic approach is presupposed." Dataphase, 640 F.2d at 113.

**B. Analysis**

    **1. Likelihood of Success on the Merits**

        **a. First Amendment Claim**

HRDC claims that Defendants' policies and refusal to deliver its magazines to Jail inmates violate HRDC's First Amendment right to communicate with incarcerated individuals. It is well established that a publisher has a First Amendment right to send publications and other correspondence to inmates. "[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." Thornburgh v. Abbott, 490 U.S. 401, 408 (1989).[1] "[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution, . . . nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the inside." Id. at 407 (internal quotation marks and citation omitted).

The Supreme Court has recognized, however, that "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." Id. (quoting Turner v. Safley, 482 U.S.78, 85 (1987)). "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by

---

[1] The parties dispute whether any inmates at the Jail subscribe to HRDC's publications. HRDC has presented a declaration from an inmate who avers that he subscribed to Prison Legal News in 2019 but suspended his subscription because the Jail would not deliver it. See Reese Aff. ¶ 3. Defendants challenge the accuracy of this declaration. See Defs.' Mem. Opp'n [Docket No. 25] at 29 n.3. For the purposes of this motion, the Court assumes HRDC has subscribers at the Jail.

decree." Turner, 482 U.S. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 404–405 (1974)). Not only does managing a prison require " expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government," prison administration is also "a task that has been committed to the responsibility of those branches." Id. at 85. As such, "separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Id.

In Turner, the Supreme Court "formulate[d] a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and to the need to protect constitutional rights." Id. (internal quotation marks and alterations omitted). Under the Turner standard, "a prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." Id. at 89. "This level of scrutiny ensures that 'prison administrators, and not the courts, [ ] make the difficult judgments concerning institutional operations.'" Murchison v. Rogers, 779 F.3d 882, 887 (8th Cir. 2015) (quoting Turner, 482 U.S. at 89) (alteration in original).

Turner established four factors that courts should consider in determining whether a regulation is reasonably related to a legitimate penological interest: (1) whether there is a "valid rational connection" between the prison regulation and the government interest advanced; (2) whether prison inmates have an alternative means exercising the restricted right; (3) whether an accommodation would have significant impact on the prison staff, other inmates, and prison resources; and (4) whether there is a "ready alternative" that would accommodate inmates' rights "at *de minimis* cost to valid penological interests." Turner, 482 U.S. at 89-91; accord Simpson v.

6

Cty. of Cape Girardeau, Missouri, 879 F.3d 273, 278 (8th Cir. 2018).  In considering these factors, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

### i. Valid Rational Connection

The first Turner factor requires a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  Turner, 482 U.S. at 89 (internal quotation marks omitted).  "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."  Id. at 89–90.  Additionally, "the governmental objective must be a legitimate and neutral one."  Id. at 90.

The Eighth Circuit "ha[s] recognized institutional security as the most compelling government interest in a prison setting."  Simpson, 879 F.3d at 279.  Here, Jail Administrator Brian Frank's ("Frank") affidavit asserts that magazines and newspapers are deemed contraband under the Jail's mail and contraband control policies because they present safety, security, and operational threats.  Frank Aff. ¶¶ 8–10.  Frank avers that magazines can be used to make body armor or weapons, send coded messages between inmates, and smuggle in contraband. including synthetic drugs.  Id. ¶ 9.  The pages of magazines can be torn out to cover windows and surveillance cameras, restricting officers' ability to monitor inmates.  Id.  Magazines are also highly combustible and can cause fires in cells.  Id.  Magazines also pose sanitation and waste issues, as they can be used to clog toilets and ventilation systems.  Id.  At this early stage of the

7

case, the Court finds that the reasons offered by Defendants are rationally related to the legitimate government interest of prison security and safety.  See Prison Legal News v. Cty. of Cook, Illinois, No. 16-CV-6862, 2016 WL 6833977, at *6 (N.D. Ill. Nov. 21, 2016) (finding at preliminary injunction stage that restrictions on newspapers were rationally related to prison security based on rationales that newspapers are flammable, can cause sanitation problems, can be used to hide contraband and send coded messages, and can be used to cover cell windows, thereby hampering guards' ability to monitor inmates); Koger v. Dart, 114 F. Supp. 3d 572, 580 (N.D. Ill. 2015) (finding policy banning newspapers was "rationally connected to jail security" based on rationales that newspapers are flammable, can be fashioned into weapons, and can cause sanitation problems).

HRDC argues that the Jail has provided only post-hoc rationales for why it adopted its policy prohibiting newspapers and magazines, and that the Jail must present evidence of the rationale for the policy at the time the policy was adopted.  The cases cited by HRDC to support this argument all address the standard of review that applies to a federal agency's action under the Administrative Procedure Act ("APA") or the Occupational Safety and Health Act ("OSHA").  See Pl.'s Reply Mem. [Docket No. 31] at 2 (citing Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891, 1905 (2020) (review of federal agency action under APA); Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971) (same); Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 540 (1981) (review of federal agency action under OSHA)).  These cases are not relevant to the Turner standard for reviewing the constitutionality of a prison regulation enacted by a state penal institution.  As the Eighth Circuit has repeatedly emphasized, Turner requires "only that the interest being served and the

policy have an objectively rational connection." Murchison, 779 F.3d at 890; Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1027 (8th Cir. 2004) (same); Herlein v. Higgins, 172 F.3d 1089, 1091 (8th Cir. 1999) (same). Indeed, Turner does not even require "actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational." Simpson, 879 F.3d at 279 (quoting Herlein, 172 F.3d at 1091).

HRDC also argues the Jail's rationales for the policy are arbitrary and underinclusive. Whether HRDC's arguments will ultimately prevail after more fulsome discovery and a complete review on the merits remains to be determined. At this preliminary stage the Court is not persuaded that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89–90.

In addition to determining whether a prison regulation is rationally related to a legitimate government interest, the first Turner factor also requires courts to "inquire whether prison regulations restricting . . . First Amendment rights operate[] in a neutral fashion, without regard to the content of the expression." Turner, 482 U.S. at 90. Prison regulations are neutral if "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security." Thornburgh, 490 U.S. at 415–16. At this early stage, the Court concludes that the Jail's mail and contraband policies appear to be neutral because they are based on security and efficiency, rather than on the content of the magazines and newspapers, and the policies apply to all magazines and newspapers. See Simpson, 897 F.3d at 279 (finding jail's postcard-only mail policy was content neutral because the policy was "based on jail security and efficiency, not based on the content of the mail itself, and the policy applied

9

to all non-legal, incoming mail").

In its reply, HRDC argues the Jail's policies prohibiting inmates from receiving magazines and newspapers is content-based because the Jail allows inmates to access the *Minneapolis Star Tribune* when they visit the recreation area. HRDC argues "[t]he Jail offers no rationale to support why this title is offered and others are not. The only possible explanation is the *Star Tribune* was selected based on its *content*." Pl.'s Reply Mem. at 11 (emphasis in original). This argument lacks persuasion. That the Jail provides the major daily newspaper in the State to inmates for shared use in the recreational area does not compel the conclusion that its policies prohibiting inmates from receiving and possessing magazines and newspapers are content based.

The Court finds that the first Turner factor weighs in favor of Defendants.

### ii.  Alternative Means to Exercise Right

The second Turner factor considers whether there are alternative means of exercising the constitutional right in question. Turner, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." Id. (internal quotation marks, citation, and alteration omitted).

On the limited record before it, the Court concludes that HRDC has alternative means of effectively communicating with inmates in the Jail. HRDC may communicate with inmates through letters and emails, which are allowed under the Jail's mail policy. Frank Aff. ¶ 11; Hruby Aff. Ex. 2 at 7, 9. Additionally, HRDC does not allege that it has attempted to donate books to the Jail's library. Although HRDC argues the Jail's policy prohibits it from donating

10

books to the library, it does not appear that HRDC has explored this possibility with the Jail. Further, although the parties do not address it, the Inmate Handbook states that inmates may receive soft covered books from a "publisher/vendor." Hruby Aff. Ex. 2 at 9. At this stage, this Turner factor weighs in favor of Defendants.

### iii. Impact on Prison Staff and Resources

The third Turner factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. When an accommodation would cause a "significant 'ripple effect'" on prison staff or other inmates, "courts should be particularly deferential to the informed discretion of corrections officials." Id.

Defendants argue that accommodating HRDC's asserted right by lifting restrictions on personal newspapers and magazines would unduly burden the Jail's operations by exponentially increasing the volume of paper entering the mail room in the form of "potentially hundreds" of newspaper and magazine subscriptions arriving at the 732-bed facility. Frank Aff. ¶ 22. According to the Frank affidavit, the Jail does not currently have dedicated mail room staff. Id. ¶ 7. Rather, the night shift master control operator first sorts the mail by housing unit, and the night shift housing officer in each housing unit inspects the mail for contraband. Id. ¶¶ 7, 28; Hruby Aff. Ex. 1 at 13.05.04 (A)–(D). Frank further avers that if all inmates were permitted to receive daily, weekly, and monthly newspaper and magazine subscriptions, the staff would be overwhelmed by reviewing the incoming publications for contraband and questionable content, and that the Jail would likely need to hire additional staff to process the mail or assist with the housing officer's other duties. Frank Aff. ¶¶ 24, 25.

HRDC argues that accommodating its rights would not significantly impact jail operations because thousands of jails in the United States are able to provide inmates with access to HRDC's publications. However, at this stage there is no evidence that the Jail is similarly situated to these other jails in terms of size, resources, and the nature of its inmate population. Thus, that other jails and prisons allow magazines does not compel the conclusion that this institution could do so without significant burden. The limited evidence in the record shows that lifting the Jail's restrictions on personal newspapers and magazines would require the Jail to dedicate more time to sorting and inspecting the mail, which would significantly impact the Jail's staff and resources. See Simpson, 879 F.3d at 281 (finding abandonment of jail's postcard-only policy to have significant ripple effect on jail's resources, staff, and inmates because it "would force the jail to dedicate more time and resources to searching the mail, which would detract from the officers' other duties related to security and inmate welfare").

On the current record, the Court finds that accommodating HRDC's asserted right would have a significant ripple effect on prison staff and the allocation of prison resources. Accordingly, the third Turner factor also weighs in favor of Defendant.

### iv. Ready Alternatives

The final Turner factor considers whether there are any ready alternatives to the policy. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90. "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Id. This factor "is not a 'least restrictive alternative' test." Id. Nevertheless, if a "claimant can point to an alternative that fully accommodates the [claimant's] rights at *de*

*minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91.

HRDC argues that a ready alternative exists because the Jail could change its mail policy to allow magazines and could review each publication individually, similar to mail policies at many other institutions. Given the existence of an alternative to the Jail's current policy, the question then becomes "whether the cost of [HRDC's proposed alternative policy] would have a greater than *de minimis* cost to the jail." Simpson, 879 F.3d at 281. Based on the Court's preliminary conclusion that the Jail's policies prohibiting personal newspapers and magazines are rationally related to the legitimate government interest of prison security and safety, the Court finds that eliminating these policies would increase the risks to Jail safety and security. This increased security risk is more than a *de minimis* cost to the Jail. See id. at 282 (finding that a post-card only mail policy was not an exaggerated response to security concerns because "[t]he risk of contraband entering the facility alone is more than a *de minimis* cost," and a more permissive policy "would force [the County] to incur that cost"). Additionally, changing the mail policy to allow magazines would "present administrative difficulty and cost [that] . . . cannot be characterized as *de minimis*," because it would require staff to devote additional resources to processing and inspecting the mail. Murchison, 779 F.3d at 892 (internal quotation marks omitted). Accordingly, the fourth Turner factor favors Defendants at this time.

Based on the above analysis of the Turner factors, HRDC has not met its burden to show that it is likely to succeed on the merits of its First Amendment claim.

### b. Due Process Claim

HRDC claims Defendants violated its Fourteenth Amendment right to due process by

failing to provide it with adequate notice and an opportunity to appeal the Jail's rejection of its magazines. Courts differ over the level of due process that is owed to a publisher when its mailings to inmates are rejected by a correctional facility based on a rule of general application (here, a rule prohibiting all magazines), rather than on censorship due to content or the status of the sender. See Human Rights Def. Ctr. v. Baxter Cty., Arkansas, 360 F. Supp. 3d 870, 877–82 (W.D. Ark. 2019) (discussing differing standards applied by courts). The parties have not cited, and this Court has not found, an Eighth Circuit case addressing the level of process that is due in these circumstances. Given the unsettled status of the law in this area and the limited record before it, the Court cannot conclude at this time that HRDC is likely to succeed on the merits of its due process claim.

### 2. Threat of Irreparable Harm

The Court next considers whether HRDC will suffer irreparable harm if a preliminary injunction is not granted. HRDC argues that without a preliminary injunction it will be deprived of its First Amendment right to communicate with incarcerated citizens. HRDC also contends that because *Prison Legal News* reports on current newsworthy topics, the passage of time saps the magazine of its news value.

The Court recognizes that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). However, as discussed above, the Court is not persuaded at this stage of the case that HRDC will prevail on the merits of its First Amendment claim. Additionally, "[i]t has long been recognized that delay in seeking relief 'vitiates much of the force of . . . allegations of irreparable harm.'" Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 894 (8th Cir. 2013)

(quoting CHS, Inc. v. PetroNet, L.L.C., Civ. No. 10-94, 2010 WL 4721073 at *3 (D. Minn. Nov. 15, 2010)).  Here, HRDC claims the Jail has been refusing to deliver its publications since at least June 2019, yet HRDC waited 14 months before filing its Complaint and motion for preliminary injunction in August 2020.  HRDC offers no explanation for why it waited over a year to seek injunctive relief.  The delay by HRDC in seeking relief undermines its argument that it will suffer irreparable injury without a preliminary injunction.  See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 603 (8th Cir. 1999) (affirming denial of preliminary injunction where plaintiff's unexplained delay in seeking moving for injunctive relief "belie[d] any claim of irreparable injury pending trial"); see also Human Rights Def. Ctr. v. Baxter Cty., Arkansas, No. 17-CV-3070, 2017 WL 6028468, at *8 (W.D. Ark. Dec. 5, 2017) (finding the irreparable harm factor "weighs against preliminary injunctive relief given HRDC's year-long delay in seeking redress"); Cty. of Cook, Illinois, 2016 WL 6833977, at *11 ("[P]laintiff's main argument related to irreparability—that *Prison Legal News* must be delivered to detainees quickly, lest the news become stale or irrelevant—is severely undermined by the fact that plaintiff waited over a year to file its complaint following the first alleged instance of censorship.").  Accordingly, this factor weighs against a preliminary injunction.

### 3.  Balance of Harms

The balance of harms factor slightly favors Defendants.  HRDC argues its interest in having its constitutional rights protected outweighs the interests of Defendants.  However, as discussed above, HRDC has not demonstrated at this stage of the litigation that it is likely to succeed on the merits of its constitutional claims.

Additionally, granting preliminary injunctive relief would require Defendants to create

and distribute a new mail policy, train their staff on the new policy, and devote additional staff resources to inspect the mail.  See Frank Aff. ¶¶ 22–27 (describing the increased burdens on staff and Jail resources if magazines and newspapers were allowed in the Jail).  HRDC argues that changing the current Jail policies would not be costly or expensive and that many jails and prisons across the country allow magazines to be delivered to inmates.  However, as earlier noted, that other jails allow magazines to be delivered to inmates does not necessarily mean that the Jail could do so without significant burden.  At this stage, the balance of harms weighs in Defendants' favor.

### 4. Public Interest

The public interest factor does not favor either party.  The Court recognizes the public interest in protecting constitutional rights, including "core First Amendment freedoms."  Iowa Right to Life Comm., 187 F.3d at 970.  This interest weighs less heavily here because HRDC has not shown a likelihood that its First Amendment rights are being violated.

There is also a public interest in ensuring prison safety and security, which is best achieved by court deference to the expertise of prison administrators.  See Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions.  Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").  Where, as here, "a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."  Turner, 482 U.S. at 85.  Accordingly, granting injunctive relief at this time may not be in the public interest.

## IV.  CONCLUSION

Based upon  upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Human Rights Defense Center's Motion for Preliminary Injunction [Docket No. 6] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT

Dated:  November 30, 2020